IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BROOKE HILYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:22-cv-705-ECM |
| | ) | [WO] |
| ELMORE COUNTY BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

**I. INTRODUCTION**

In August 2022, a due process hearing was held pursuant to ALA. ADMIN. CODE r. 290-8-9.08(9)(c) to determine if L.H., a student at Holtsville Elementary School ("H.E.S."), was provided with a free and appropriate education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 and ALA. ADMIN. CODE r. 290-8-9.  After the Hearing Officer determined that the Defendant, Elmore County Board of Education, had provided a FAPE, the Plaintiff (or "the Parent") filed the instant case in this Court pursuant to 20 U.S.C. § 1415(i)(2)(A).

Now pending before the Court are the Defendant's motion for summary judgment (doc. 35) and the Plaintiff's motion for judgment on the administrative record (doc. 37). Because motions for summary judgment in IDEA act cases are the functional equivalent of a "judgment on the record," the Court construes the Plaintiff's motion (doc. 37) as a motion for summary judgment. *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d

1309, 1313 (11th Cir. 2003) (citation omitted).  The Court finds that L.H.'s Individual

Education Plan ("IEP") was reasonably calculated to enable L.H. to receive an educational

benefit, and that there is insufficient evidence to find that L.H. was not provided with a

FAPE.  The Plaintiff's motion (doc. 37) is due to be DENIED, and the Defendants motion

(doc. 35) is due to be GRANTED.

## II.  JURISDICTION

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331. The parties do not contest personal jurisdiction or venue, and the Court concludes

that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III. STANDARD OF REVIEW

"[T]he usual F.R. Civ. P. 56 summary judgment principles do not apply in an IDEA

case." *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir.

2003).  "[S]ummary judgment [in IDEA cases] has been deemed appropriate even when

facts are in dispute, and is based on a preponderance of the evidence." *Loren*, 349 F.3d at

1313 (second alteration in original) (citing *Beth B. v. Van Clay*, 282 F.3d 493, 496 n.2 (7th

Cir. 2002)).  Consequently, "the district court's decision 'is perhaps better described as

judgment on the record.'" *Loren*, 349 F.3d at 1313 (citing *Beth B.*, 282 F.3d at 496 n.2).

Whether an educational program provided an adequate education under the Act "is a mixed

question of law and fact subject to de novo review." *Draper v. Atlanta Indep. Sch. Sys.*,

518 F.3d 1275, 1284 (11th Cir. 2008) (citing *CP v. Leon County Sch. Bd. Fla.*, 483 F.3d

1151, 1155 (11th Cir. 2007)).  "The burden of proof in an administrative hearing

challenging an IEP is properly placed upon the party seeking relief." *Schaffer ex rel.*

*Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *see also J.N. ex rel. M.N. v. Jefferson Cnty. Bd. of Educ.*, 12 F.4th 1355, 1365 (11th Cir. 2021).

In an IDEA case, the Court must decide "(1) whether the state actor has complied with the procedures set forth in the IDEA, and (2) whether the IEP developed pursuant to the IDEA is reasonably calculated to enable the child to receive educational benefit." *Sch. Bd. of Collier Cnty., Fla. v. K.C.*, 285 F.3d 977, 982 (11th Cir. 2002) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07 (1982)).   A "district court conducts an entirely de novo review of the [Hearing Officer's] findings . . . and has the discretion to determine the level of deference it will give to the [Hearing Officer's] findings." *Sch. Bd. of Collier Cnty.*, 285 F.3d at 983 (first citing *Rowley*, 458 U.S. at 205, then citing *Doe v. Ala. State Dep't of Educ.*, 915 F.2d 651, 657 n.3 (11th Cir. 1990)).   However, "the administrative decision in an IDEA case is entitled to due weight and the [C]ourt must be careful not to substitute its judgment for that of the state educational authorities." *Walker Cnty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000) (citing *Rowley*, 458 U.S. 176).   "As such, 'administrative factfindings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.'" *Blount Cnty. Bd. of Educ. v. Bowens*, 929 F. Supp. 2d 1199, 1202 (N.D. Ala. 2013), aff'd, 762 F.3d 1242 (11th Cir. 2014) (citing *Loren*, 349 F.3d at 1314 n.5).[1]

---

[1] The Court here, and elsewhere in the opinion, cites to non-binding authority.  While the Court recognizes that these cases are not precedential, the Court finds them persuasive.

## IV. FACTS

L.H. is a special education student diagnosed with autism. He is nonverbal and has a significant cognitive disability.  At the time of the hearing, L.H. was ten years old and was in fourth grade at H.E.S. during the previous school year.  L.H. was assigned to fifth grade at Millbrook Middle School ("M.M.S.") for the 2022-2023 school year.  There is no dispute that L.H. is a student with a disability who is eligible for special education services under the IDEA.  While L.H. has improved behaviorally over the years, he struggles with meltdowns and does well with a routine. (Doc. 24-1 at 445).   L.H. started medication at age nine and his Parent started seeing progress in his behavior.  For example, L.H. decided that he wanted to learn how to communicate and now uses a few words. (*Id.* at 538). However, L.H.'s Parent attributes his success to the private clinical services that he received, rather than the school system.  At the time of the due process hearing, the Parent wanted L.H. to remain at H.E.S.  While the Plaintiff's claims based on the transfer of schools, violations of the occupational therapist, and facts outside the statute of limitations were dismissed by this Court, (*see generally* doc. 27), the Parent also contends that L.H. has not been provided a FAPE because his IEPs are deficient, and he was not provided with extended year school services.

Tonya Wilson ("Wilson") was L.H.'s special education teacher in the self-contained unit at H.E.S. for the three years preceding the due process hearing. (Doc. 24-1 at 846). Wilson has a Master's degree in early childhood special education. (*Id.* at 831).  As L.H.'s primary teacher, Wilson selected L.H.'s annual measurable goals for his 2021-2022 and 2022-2023 IEP plans.  Wilson is required to use state standards for academic goals.

4

Because L.H. is on the Alternative Achievement Assessment and uses the extended standards, his standards are broken into smaller parts. (*Id.* at 834).  When selecting L.H.'s measurable annual goals, Wilson began by considering the standards for L.H.'s grade level and the applicable extended standards, and then chose goals with which she felt L.H. would be successful.  (*Id.* at 841).  Wilson also used the Kaufman Test of Educational Achievement and a "Brigance for learning" test in creating L.H.'s IEP. (*Id.* at 833).  The measurable annual goals were chosen for that school year, rather than the calendar year. (*Id.* at 843).  Wilson built her curriculum from her teaching experience, workshops, and feedback from other teachers. (*Id.* at 886).  Because L.H. is on the extended standards, Wilson also gave L.H. benchmarks to break each measurable annual goal down into smaller parts. (*Id.* at 839).

Mastering a goal meant that L.H. had met all the criteria for that goal. (*Id.* at 840). L.H. has never mastered a measurable annual goal, however, he has met benchmarks for certain goals. (*Id.* at 845–46).  Because L.H. is on the Alternate Achievement Assessment and uses extended standards, he takes his assessments in a one-on-one setting and in smaller parts. (*Id.* at 834).  Wilson testified that L.H. initially would try and pick all answers on assessments. (*Id.* at 838).  Within the last year, L.H. began selecting only one answer, but appeared to indiscriminately select the first answer each time. (*Id.* at 838). Consequently, Wilson thought that the assessment did not accurately reflect L.H.'s ability. (*Id.* at 838–39).  Behaviorally, during the two years before the hearing, L.H. made progress in the form of fewer meltdowns and increased communication and engagement. (*See id.* at 502, 538).

At the end of the 2021-2022 school year, it was recommended that L.H. advance to fifth grade for the 2022-2023 school year.  L.H.'s Parent filed a complaint for a due process hearing, asserting that L.H. was denied a FAPE.  A due process hearing was conducted in August of 2022.  The hearing officer found that the Defendant provided a FAPE to L.H. in his least restrictive environment. (Doc. 24-2 at 5).   The Plaintiff now challenges that decision.

### A. 2021-2022 School Year

L.H. was in fourth grade during the 2021-2022 school year.  The 2021-2022 IEP planning meeting occurred on April 12, 2021.  L.H.'s Parent, general education teacher, special education teacher, and a local education agency representative were among those in attendance at the IEP planning meeting. (Doc. 24-1 at 351).  L.H's Parent indicated at the meeting that they wanted L.H. to increase speech and interactions with his peers. (*Id.* at 880).  The IEP indicates that L.H.'s "delays in academic areas, as well as expressive and receptive communication development, restrict his ability to fully participate in the general classroom setting[.]" (*Id.* at 343).  Consequently, "specialized instruction in the multi-disabilities classroom with opportunities for inclusion with non-disabled peers" would better promote social interaction, communication, and life skills. (*Id.* at 343).  The IEP indicates that the least restricted environment for L.H. consists of less than forty-percent of the day in the regular education environment. (*Id.* at 351).

Wilson collected data throughout the year on L.H.'s progress, which was reported to the Parent every nine weeks.  L.H.'s 2021-2022 IEP contained goals in the subjects of reading, math, science/life skills, and communication. (*Id.* at 342–51).  L.H.'s math goal

was adapted from the fourth-grade standard and involved choosing which numbers had higher or lower values; then Wilson tied this skill to community lessons. (*Id.* at 889). During the year, Wilson would focus on meeting an annual measurable goal and build upon progress each nine-week term. (*Id.* at 890).  For example, Wilson first worked with L.H. on putting numbers from one to twenty in order so he could understand and compare values, and then they would move on to higher numbers. (*Id.*).  The IEP reflects this progress, as L.H.'s math benchmarks begin with the goal of matching whole numbers up to fifty, which he mastered, and then gradually work up to comparing the value of numbers. (*Id.* at 394).

L.H.'s science life skills goal involved identifying sensory organs and the purposes of those organs. (*Id.* at 891).  This skill was taught through videos, songs, and worksheets. (*Id.*).  Wilson thought this skill would help L.H. communicate physical needs. (*Id.* at 892). L.H.'s reading goal involved matching words with pictures or objects. (*Id.* at 392).  Wilson chose a reading goal that she thought would be "a little difficult for him to achieve," but on which he could make progress. (*Id.* at 879–80).  Wilson focused on teaching words that L.H. could incorporate into life skills later on, such as "food," "help," and "exit." (*Id.* at 883–84).  A research-based program called Unique Learning was sometimes used to teach these words, where L.H. could touch the words on a screen. (*Id.* at 885, 888 & 921).  Wilson used a variety of techniques to teach L.H. to match and identify words because L.H. had a tendency to answer questions based on the order of the answers rather than correctness. (*Id.* at 888–89).  L.H.'s communication goal included identifying synonyms and antonyms and answering who, what, when, and where questions. (*Id.* at 348).

L.H. made progress toward his 2021-2022 IEP goals and met benchmarks in the subjects of reading and math. (*Id.* at 390). L.H.'s 2021-2022 IEP stated that "Extended School Year services were discussed by the IEP team; however, it was determined that summer services are not warranted . . . as [L.H.] has made progress towards his 2021/2022 IEP goals and does not meet the requirements set forth by state and local education agencies." (*Id.* at 343).

During the 2021-2022 school year, L.H. interacted with his peers during physical education, field trips, and class parties. (*Id.* at 871–72). In an effort to address the Parent's desire to have L.H. interact with peers more, Wilson would reach out to the general education teacher to stay informed on when the class had special events, such as picture day, awards day, field day, and other days where L.H. could interact with his peers. (*Id.* at 878–79). L.H. initially went to lunch with his peers, but because of COVID, L.H. began to eat with another third-grade class. (*Id.* at 871). When the fourth-grade class started to return to the lunchroom, L.H. sat at the table with them. (*Id.* at 876). L.H. also started out the year in homeroom with his fourth-grade peers. However, L.H. did not do well with wearing a COVID-related mask and did better with the routine of going straight to Wilson's classroom, so he stopped attending homeroom on a regular basis. (*Id.* at 872–73). The self-contained unit allowed L.H. to keep a routine, focus on his individual goals, and receive more one-on-one and small group time. (*Id.* at 875).

L.H.'s paraprofessional went to physical education with him, provided support during transitions from one classroom to the next, and worked with L.H. one-on-one when Wilson was teaching another student. (*Id.* at 893). An occupational therapist helped with

daily functional skills, like buttoning clothes or interacting with peers.  The school-year sessions were well-documented by the occupational therapist and take-home summer skills were provided for L.H. (*See id.* at 404–10).  The 2022-2023 IEP Planning Sheet indicates that in the 2021-2022 school year, L.H. worked on "fine motor skills, handwriting skills, self-help skills, and visual perceptual/visual motor skills." (*Id.* at 362).  These skills included buckling and unbuckling, and using a zipper, scissors, and snaps. (*Id.* at 362–363).  Occupational therapy was supposed to happen once a week, but some sessions were missed. (*Id.* at 363, 918–19).  At the beginning of the year, the school was in the process of hiring another occupational therapist. (*Id.* at 896).  L.H.'s Parent inquired about getting occupational therapy services, and Wilson said she would inform school personnel that L.H. still needed services and that those services would be made up. (*Id.* at 894).  Katie Pouncy, L.H.'s occupational therapist, confirmed in her testimony that all services L.H. missed were indeed made up. (*Id.* at 623–24).

### B. 2022-2023 IEP Meeting

The 2022-2023 IEP Planning Meeting occurred on April 7, 2022.  Wilson was present at the meeting, along with L.H.'s Parent, the principal, the speech therapist, a representative from transportation, and the self-contained teacher, speech therapist, occupational therapist, and Applied Behavioral Analysis therapist from M.M.S., the school that L.H. would be attending for the 2022-2023 school year. (Doc. 24-1 at 896).  The meeting minutes from the 2022-2023 IEP Planning Meeting indicate that the Parent's main concern was that she wanted L.H. to repeat the fourth grade and stay at H.E.S. The IEP team explained why they believed that advancement to the fifth grade at M.M.S. was in

L.H.'s best interest. (*Id.* at 376).  The Parent also expressed that she wanted more one-on-one time for L.H in occupational therapy and was concerned that L.H. could not make up missed sessions before summer. (*Id.* at 375).  Extended Year Services were also considered but determined not to be warranted. (*Id.* at 374–75).  The 2022-2023 IEP stated that "summer services are not warranted at this time as [L.H.] has made progress toward mastery of his 2021/2022 IEP goals and does not meet the requirements set forth by state and local education agencies." (*Id.* at 377).  For the same reasons as the 2021-2022 school year, it was determined that it was not in L.H.'s best interest to fully participate in a general education classroom and that the self-contained classroom would better promote communication, social interaction, and life skills. (*Id.* at 363).  The IEP sheet indicates that the least restricted environment for L.H. again consisted of less than forty-percent of the day inside the general education environment. (*Id.* at 372).

L.H.'s 2022-2023 IEP goals were in the subjects of math, reading, science, and adaptive/functional skills. (*Id.* at 375).  L.H.'s math goal included recognizing money, which built off the skill of recognizing higher and lower values from the year before. (*Id.* at 365, 897–98).  L.H.'s reading goal included comparing and contrasting characters or events in stories through selecting picture cards. (*Id.* at 366).  The reading goal was selected because it was a fifth-grade skill, the grade L.H. was now entering, and involved the new aspect of word comprehension as opposed to letter-word recognition. (*Id.* at 898–899).  No participants at the meeting had questions or discussions about L.H.'s math or reading goals. (*Id.* at 899).

L.H.'s science goal included identifying human actions that help the environment like, for example, picking up after yourself. (*Id.* at 367, 899).  Each student in the class had the same science goal, but different benchmarks or ways to demonstrate his or her knowledge. (*Id.* at 900).  Generally, each student focused on similar goals in each grade level, but the goal and benchmarks would be tailored to each student's ability. (*Id.* at 901).  Wilson received feedback from the fifth-grade self-contained teacher on a goal that involved writing out L.H.'s address and phone number, which was implemented into the IEP as an adaptive/functional skill. (*Id.* at 368, 901–903).  Occupational therapy was also changed to be provided in a one-on-one setting in response to L.H.'s Parent's request. (*Id.* at 907).  Occupational therapy and speech therapy were to be provided once a week, and L.H. was to have access to a paraprofessional daily. (*Id.* at 376).

### C. Hearing Officer's Decision

On or about April 12, 2022, the Parent filed a due process complaint, and a due process hearing was conducted on August 16, 2022 and September 16, 2022.  No party alleged a procedural defect in any pre-hearing proceedings.  The Hearing Officer found that the Defendant provided L.H. with a FAPE.

The Parent claims, in this action, that L.H. was denied a FAPE because (1) L.H.'s IEPs lacked meaningful, measurable goals; (2) L.H.'s IEPs failed to acknowledge that L.H. has not mastered any measurable goals; (3) L.H. did not receive extended year services; (4) the IEPs do not provide opportunities for L.H. to interact with his non-disable peers; and (5) the special education services provided were not based on peer-reviewed research. This Court previously dismissed the Plaintiff's claims based on L.H.'s transfer to M.M.S.,

any violations by the occupational therapist, and any actions outside the statute of limitations.[2]  (*See generally* doc. 27).

## V. DISCUSSION

### A. IDEA

The IDEA "establishes a substantive right to a 'free appropriate public education' for certain children with disabilities," also known as a "FAPE." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citing *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176 (1982)). "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* at 391 (citing *Rowley*, 458 U.S. at 181).  "An IEP is a written document that a public school produces in collaboration with a student's Parents or guardians, the student's general and special education teachers, and the representatives of the state educational agency collectively known as the IEP Team." *Rosaria M. v. Madison City Bd. of Educ.*, 325 F.R.D. 429, 433–34 (N.D. Ala. 2018) (citing 20 U.S.C. § 1414(d)(B)).  "[T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988) (citing 20 U.S.C. § 1401(19)).

---

[2] The Plaintiff admitted that she could not base claims on actions taken more than two years before the filing of the complaint for a due process hearing.  (Doc. 25 at 5).  The complaint for a due process hearing was filed on or about April 12, 2022. (Doc. 1 at 3; *see also* doc. 24-1 at 103).  Consequently, the Court will not consider the Defendant's actions taken before April 12, 2020.

The IEP must include, among other things, "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals, including academic and functional goals," "a description of how the child's progress toward meeting the annual goals . . . will be measured," "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child," and "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class." 20 U.S.C. § 1414(d)(1)(A)(i).  In developing an IEP, the IEP Team "shall consider-- (i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent evaluation of the child; and (iv) the academic, developmental, and functional needs of the child." 20 U.S.C. § 1414(d)(3)(A).  Another special consideration includes "the communication needs of a child." 20 U.S.C. § 1414(d)(3)(B).

"The IEP must be reviewed and, where necessary, revised at least once a year[.]" *Honig*, 484 U.S. at 311 (citing 20 U.S.C. § 1414(a)(5)).  The IEP should be revised to address "(I) any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate; (II) the results of any reevaluation . . . ; (III) information about the child provided to, or by, the parents . . . ; [or] (IV) the child's anticipated needs . . . ." 20 U.S.C. § 1414(d)(4)(A)(ii).

> To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials.

*Endrew*, 580 U.S. at 399 (citation omitted).  In reviewing an IEP, the "question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew*, 580 U.S. at 387 (citing *Rowley*, 458 U.S. at 206–207).

For students in a regular classroom, an IEP "should be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Id.* at 401 (citing *Rowley*, 458 U.S. at 204).  For a child who is not fully integrated into a regular classroom, like L.H., his "educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id.* at 388.  An IEP that offers "merely more than de minimis" progress does not meet the IDEA standard, as "receiving instruction that aims so low would be tantamount to 'sitting idly . . . awaiting the time when they were old enough to "drop out."'" *Id.* at 387 (citing *Rowley*, 458 U.S. at 179).  What constitutes an adequate IEP "turns on the unique circumstances of the child," but the "absence of a bright-line rule . . . should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* at 388 (citing *Rowley*, 458 U.S. at 206).

The Plaintiff puts forth five reasons for why L.H. did not receive a FAPE: (1) L.H.'s IEPs lacked meaningful, measurable goals; (2) the IEPs failed to acknowledge that L.H. has not mastered any measurable goals; (3) L.H. was not provided extended school year services; (4) the IEPs lacked opportunities for L.H. to participate with his non-disabled peers; and (5) the lack of scientifically based strategies in the IEPs, including peer-

reviewed research.  The Plaintiff asks the Court to set aside the Hearing Officer's decision, to affirmatively find that L.H. was not provided a FAPE, and for reimbursement for any compensatory education required as a result of the Defendant's failure to provide a FAPE.

The Court must decide "(1) whether the state actor has complied with the procedures set forth in the IDEA, and (2) whether the IEP developed pursuant to the IDEA is reasonably calculated to enable the child to receive educational benefit." *Sch. Bd. of Collier Cnty., Fla. v. K.C.*, 285 F.3d 977, 982 (11th Cir. 2002) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07 (1982)).  No party challenges that Elmore County Board of Education complied with the procedural aspects of IDEA.  Thus, the issue before the Court is whether L.H.'s IEP was reasonably calculated to enable him to receive an educational benefit.

### B.  IEP Plan Goals

The Plaintiff first argues that L.H. was denied a FAPE because the IEP was not created with regard to L.H.'s individual circumstances.  In support, the Plaintiff contends that L.H.'s teacher reported that all fourth graders in her class had the same academic goals, that the academic plan emphasized "required" subject matter, and that functional daily living goals were absent from L.H.'s IEP.

The Court disagrees with this characterization of the record.  L.H.'s teacher testified that students in the same grade level would focus on similar goals, and that she built annual measurable goals by first considering the standards for each grade level.  Alabama law requires that Wilson follow the Alabama Extended Standards when writing L.H.'s IEP Plan. ALA. ADMIN. CODE r. 290-8-9-.05(6)(o) ("Academic goals must be written to general education content standards; or Alabama Extended Standards for students with significant

15

cognitive disabilities . . . .").   Further, Wilson testified that after considering state standards, she tailored each goal to the individual student's ability. (Doc. 24-1 at 901).   For example, each student would have different benchmarks or ways to demonstrate their knowledge of a particular goal depending on their individual circumstances.   Wilson chose skills that she believed L.H. could build upon in future years.

As to the Plaintiff's second contention, the record shows that L.H. did have "functional" goals at school that were incorporated into the IEP plans.   The occupational therapist worked with L.H. about once a week, and their progress is well-documented. (*See* Doc. 24-1 at 405–10).   When L.H.'s Parent requested that L.H. receive one-on-one sessions with the occupational therapist, the request was incorporated into the IEP plan.   The occupational therapist helped with daily functional skills, like buttoning clothes, handwriting, using scissors, buckles, and snaps, and interacting with peers.   Additionally, the occupational therapist's testimony reflects that she made up any missed sessions with L.H.   For the 2022-2023 school year, L.H. had the functional goals of writing his telephone number and address added to his IEP in response to feedback from his fifth-grade teacher.

The Court agrees with the Hearing Officer that L.H.'s IEP was "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew*, 580 U.S. at 399.

### C.  Mastery of Goals

The Plaintiff argues that the failure of L.H.'s IEP is evident from the fact that L.H. has not mastered a single measurable annual goal going back to the 2018-2019 IEP.[3] Indeed, there is no evidence that L.H. mastered an annual measurable goal, but he did meet benchmarks and make behavioral and academic progress.  Further, "the appropriate standard is not how much [L.H.] has progressed, but rather the adequacy of the IEP at its inception." *Jefferson Cnty. Bd. of Educ. v. Amanda S.*, 418 F. Supp. 3d 911, 918 (N.D. Ala. 2019) (citing *D.J.D., ex rel. Driver v. Madison Cty. Bd. of Educ.*, 2018 WL 4283058, at *5 (N.D. Ala. Sept. 7, 2018)).  L.H.'s teacher testified that she developed his goals to challenge him.  L.H. met benchmarks in his IEPs, even if he did not meet the annual measurable goal. Further, he had fewer meltdowns and made behavioral progress.  The record supports a finding that L.H.'s IEP goals were reasonably crafted to enable him to make progress.  This Court agrees with the Hearing Officer's finding that L.H. "had the chance to meet challenging objectives," and that "mastery of goals is not the proper analysis." (Doc. 24-2 at 32–33).

### D.  Extended Year Services

The Plaintiff argues that despite the fact that L.H. has never mastered a measurable goal, he was never given the opportunity to do so with extended year services, and consequently he was denied a FAPE.  The Alabama Administrative Code instructs that

---

[3] The Defendant argues that the 2018-2019 IEP is outside the statute of limitations. The Plaintiff previously conceded that she would not base her claim on actions outside of the applicable statute of limitations, or on actions taken before April 12, 2020.  While claims originating before this date are time-barred, the Court considers this evidence to the extent that it is relevant to the timely claims before it.

"[t]he length of a program for a child with a disability may not be limited to the regular school term/year if an interruption in educational services is likely to deny a child FAPE." ALA. ADMIN. CODE r. 290-8-9-.05(9).  Further, "[o]ne criteria that may be considered by the child's IEP Team is if significant regression, caused by an interruption in educational services, renders it unlikely that the child will regain critical skills even after an appropriate recoupment period." ALA. ADMIN. CODE r. 290-8-9-.05(9).  The Administrative Code also requires that the public agency "ensure that extended school year services are available as necessary to provide FAPE," but clarifies that "[e]xtended school year services must be provided only if a child's IEP Team determines, on an individual basis, that the services are necessary for the provision of FAPE to the child." ALA. ADMIN. CODE r. 290-8-9-.05(9)(a)–(b).  Similarly, the IDEA requires that "extended school year services are available as necessary to provide FAPE," and that "[e]xtended school year services must be provided only if a child's IEP Team determines, on an individual basis, . . . that the services are necessary for the provision of FAPE to the child." 34 C.F.R. § 300.106.

The Hearing Officer did not speak to extended year services in his opinion.[4]  However, the record shows that L.H.'s IEP team considered extended school year services at each IEP Meeting. (Doc. 24-1 at 351, 372).  L.H.'s 2021-2022 IEP states that "Extended School Year services were discussed by the IEP team; however, it was determined that

---

[4] The Defendant renews its argument that the Plaintiff did not meet the exhaustion requirements in IDEA because the Plaintiff did not put forth evidence of the extended year services claim at the due process hearing. (Doc. 40 at 11).  This Court already found that the issue of extended year services was properly raised at the due process hearing. (Doc. 27 at 5).  Further, the record shows that the Plaintiff bases her argument for this claim on evidence that was properly before the Hearing Officer, namely, that because L.H. failed to master an annual goal during the school year, extended year services were required to provide him a FAPE.

summer services are not warranted at this time as [L.H.] has made progress towards his 2021/2022 IEP goals and does not meet the requirements set forth by state and local education agencies." (Doc. 24-1 at 343). The 2022-2023 IEP Meeting notes also indicate that Extended Year Services were considered but determined not to be warranted. (Doc. 24-1 at 374–75). The Parent did not object to these determinations.

Whether the child has met his measurable annual goals is not a consideration mandated by state or federal law. Under state law, whether there will be significant regression is instead the proper consideration. ALA. ADMIN. CODE r. 290-8-9-.05(9). The ALA. ADMIN. CODE r. 290-8-9-.05(9)(a)–(b) says that extended year services must only be provided if the IEP Team determines on an individual basis that they are required to provide a FAPE. L.H.'s IEP Team considered extended year services for L.H. on an individual basis at each IEP Planning Meeting but determined that they were not warranted under state standards. Petitioner fails to provide sufficient evidence to the contrary or that the IEP Team's reasoning in reaching their decision was incorrect. Thus, the Plaintiff has presented insufficient evidence that L.H. was denied a FAPE on the basis that the school did not provide extended year services.

### E.  Participation with Non-Disabled Peers

The Plaintiff next argues that L.H. was denied a FAPE because he was not provided opportunities for interaction with his non-disabled peers. Under the IDEA, children with disabilities must be educated in the least restrictive environment, meaning, "[t]o the maximum extent appropriate," that they "are educated with children who are not disabled," and that separate or special classes occur "only when the nature or severity of the disability

19

of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A).   Alabama regulations require that the placement determination must be based on the child's IEP, "giving consideration to any potential harmful effect on the child," and that the decision must be made at least annually in a group including the student's Parents. ALA. ADMIN. CODE r. 290-8-9-.06(1).

The Eleventh Circuit has adopted the following test to determine if a child has been educated in the least restrictive environment:

> First, we ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily . . . . If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate.

*S.M. v. Gwinnett Cnty. Sch. Dist.*, 646 F. App'x 763, 764 (11th Cir. 2016) (citing *Greer v. Rome City Sch. Dist.*, 950 F.2d 688 (11th Cir. 1991)). The Hearing Officer applied this test and found that "the District presented credible evidence that a general education classroom placement for this Child cannot be satisfactorily achieved." (Doc. 24-2 at 26).  Further, the Hearing Officer found that the Petitioner "failed to demonstrate that a less restrictive environment is appropriate" or "that the self-contained unit is inappropriate" for L.H. (*Id.* at 26–27).

The Court agrees with the Hearing Officer's finding.  The record reflects that the IEP Team determined that education in the regular classroom could not be achieved satisfactorily for L.H., who is diagnosed with autism and has significant cognitive delays.

This determination was made in each IEP plan, which explained that placement in the special education classroom would be in L.H.'s best interest academically and socially, as he could focus on his individual goals. Further, the record shows that Wilson mainstreamed L.H. to the best of her ability. L.H. was with non-disabled peers during physical education, lunch, field day, field trips, and class parties. L.H. tried to join his peers in homeroom but had to stop because he did not want to wear a COVID-related mask. L.H. also did better with the routine of going straight to his special education classroom. Wilson ensured that she stayed in contact with the general education teacher regarding opportunities for L.H.'s inclusion with peers in response to the Parent's request that L.H. spend more time with his nondisabled peers. The Court agrees with the Hearing Officer that the Plaintiff has failed to provide sufficient evidence that L.H. was not provided a FAPE in his least restricted environment.

### F. Peer-Reviewed Research

Finally, the Plaintiff argues that the Defendant failed to provide special education services *based on peer reviewed research* as required under ALA. ADMIN. CODE r. 290-8-9.05(6)(c) and the IDEA. Rule 290-8-9.05(6)(c) requires that all IEPs include "[a] statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child . . . ." *Id.* This same requirement is included in the IDEA. 20 U.S.C. § 1414(d)(1)(A)(IV). The Hearing Officer found that peer reviewed research is not required to be included in the IEP. (Doc. 24-2 at 35). As support, the Hearing Officer cited to the Alabama State Department of Education's "Mastering the Maze" materials, which say that

21

"[n]aming a specific program in the IEP is not recommended because a specific program may change[.]" (AL. STATE DEP'T EDUC., MASTERING THE MAZE: THE SPECIAL EDUCATION PROCESS 172 (2019)).  The Defendant argues that not only was the Hearing Officer's determination correct, but that the educational services provided to L.H. were based on peer-reviewed research.  For example, Unique Learning was a research-based curriculum used in L.H.'s education.

There remains little guidance on what the language "based on peer-reviewed research" requires.  The Third Circuit addressed this issue in *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260 (3d Cir. 2012), stating that "although schools should strive to base a student's specially designed instruction on peer-reviewed research to the maximum extent possible, the student's IEP team retains flexibility to devise an appropriate program, in light of the available research." *Ridley*, 680 F.3d at 276 (citing *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010); 71 Fed. Reg. 46540, 46,665 (Aug. 14, 2006)).  In support, the Third Circuit cited to the Department of Education's Analysis of Comments and Changes to the 2006 IDEA Regulations, 71 Fed. Reg. 46,540 (Aug. 14, 2006) ("Analysis of Comments and Changes").  In the Analysis of Comments and Changes, the Department of Education clarified that the requirement that an IEP include a statement of special education services based on peer reviewed research requires that school personnel

> select and use methods that research has shown to be effective, to the extent that methods based on peer-reviewed research are available.  This does not mean that the service with the greatest body of research is the service necessarily required for a child to receive FAPE.  Likewise, there is nothing in the Act to suggest that the failure of a public agency to provide services based on peer-reviewed research would automatically result in

> a denial of FAPE.  The final decision about the special
> education and related services, and supplementary aids and
> services that are to be provided to a child must be made by the
> child's IEP Team based on the child's individual needs.

71 Fed. Reg. at 46,665.  Further, the Department of Education declined "to require all IEP Team meetings to include a focused discussion on research-based methods," as it would be overly burdensome. *Id*.

The "Mastering the Maze" materials cited to by the Hearing Officer also states that "peer reviewed research means there is reliable evidence that the program or services are effective," and that the "IEP Team should have strong evidence (i.e., journal publications, programs that are known to be scientifically based researched, teacher data) of the effectiveness of instructional programs and other services before proposing them in an IEP." (AL. STATE DEP'T EDUC., MASTERING THE MAZE: THE SPECIAL EDUCATION PROCESS 172 (2019)).

The Plaintiff argues that Wilson's inability to define peer-reviewed research when prompted during the hearing is evidence that the Defendant did not comply with the statute's requirement in developing L.H.'s IEP.  The Plaintiff points to the following line of questioning:

> Q:   All right. Turn over to page 53. This is the -- I guess the first question I need to ask you is: Do you know what peer-reviewed research means?
> A:   I would say --
> Q:   Do you know --
> A:   Peer-reviewed research?
> Q:   Peer-reviewed research.
> A:   No, sir.
> Q:   So you don't know that that is required by state and federal law that special education services be based upon peer-reviewed research?
> A:    Research based.

. . .

Q:   Okay. Well, it says here, "[L.H.] will receive special education services."

A:   Uh-huh.

Q:   What are those special education services?

A:   It's the services I provide in the instruction, in modified instruction. Instruction that's catered more toward helping him being successful.

Q:   Where is the peer-reviewed research basis of that?

A:   (Witness indicating).

Q:   You don't know?

A:   I don't know. I'm not --

Q:   All right. That's fair enough. If you don't know, you don't know.

(Doc. 24-1 at 867–69).

The Court finds that the Plaintiff presents insufficient evidence to show that the IEP Plan's special education services were not based on peer-reviewed research to the extent practicable, or that the services provided in the IEP were not based on reliable evidence. The Department of Education's Analysis of Comments and Changes says that an IEP must "select and use methods that research has shown to be effective, to the extent that methods based on peer-reviewed research are available." 71 Fed. Reg. at 46,665. "Likewise, there is nothing in the Act to suggest that the failure of a public agency to provide services based on peer-reviewed research would automatically result in a denial of FAPE." 71 Fed. Reg. at 46,665. Further, Wilson testified that she used Unique Learning in her curriculum, and that the program is research-based, used throughout the county, and that she had training on the program. (Doc. 24-1 at 921). While the record does not indicate whether this program is specifically based on peer-reviewed research, there is also insufficient evidence to conclude that the methods used were not based on peer-reviewed research to the extent practicable, or otherwise not based on reliable evidence, such that they violated federal and

state requirements.  Although no discussion of peer-reviewed research is included in the IEP Plan or meeting notes, the Department of Education's Analysis of Comments and Changes indicates that this sort of discussion is not required.  The Court finds that the Plaintiff has presented insufficient evidence to show that a failure to include IEP services based on peer-reviewed research resulted in denial of a FAPE.

## VI. CONCLUSION

The Court finds that the Plaintiff has not presented sufficient evidence to show that L.H. was denied a FAPE.

Accordingly, and for good cause, it is

ORDERED that the Defendant's Motion for Summary Judgment (doc. 37) is GRANTED, the Plaintiff's motion or summary judgment (doc. 35) is DENIED, and the Plaintiff's claims are DISMISSED with prejudice.

A separate Final Judgment will enter.

Done this 16th day of February, 2024.

   /s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE